1    **WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Hart Interior Design LLC 401(k) Profit Sharing Plan, | No. CV-16-02347-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Recorp Investments Incorporated, et al., | |
| Defendants. | |

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment, (Doc. 81), Defendants' Motion for Summary Judgment, (Doc. 83), Plaintiff's Motion to Strike, (Doc. 86), Plaintiff's Motion to Bifurcate Case and Stay, (Doc. 94), and Plaintiff's Motion to Disregard New Arguments, (Doc. 95). The Court rules as follows on these motions as further explained below.

## BACKGROUND

On June 30, 2000, Paul B. Maniatis organized Carinos Properties, LLC ("Carinos"). (Doc. 82 ¶¶ 1, 3). Carinos's original Operating Agreement states, "This Company has been formed to engage in purchasing, financing, refinancing, developing, managing, operating, selling, exchanging or otherwise disposing of real property, and may engage in any other activities that may be lawfully engaged in by limited liability companies." (Doc. 84 ¶ 63, Doc. 84-1 Exh. A).[1] Carinos was managed by another of Mr.

---

[1] The Plaintiff requested that the Court strike portions of Defendants' Statement of Facts in Document 84-1 for violating the Court's case management order. (Doc. 86). The Court denies the motion and considers the disputed material as an index to the

Maniatis's entities—Defendant Recorp Investments, Inc. ("RII"). (Doc. 82 ¶ 3). On August 9, 2000, Plaintiff Hart Interior Design, LLC 401(k) Profit Sharing Plan ("the Plan"), acquired a 28 percent membership interest in Carinos. (Doc. 82 ¶ 6).

In September 2000, Carinos purchased more than 1,250 acres of property near Albuquerque, New Mexico, where five other of Mr. Maniatis's entities owned the surrounding 9,750 acres. (Doc. 84 ¶¶ 18–19). In June 2001, Mr. Gary Lane of the related company Recorp Management Inc. submitted the "Rio West Community Master Plan" for the 12,000 acres to establish "land use designations and regulations, intensities, provisions for public facilities, design regulations, phasing schedules, and procedures for administration and implementation." (Doc. 84-1 Exh. C). Although the trustee of the Plaintiff, Ms. Athena Hart-Kolle, generally knew about the Rio West Community, she understood that Carinos's purpose was simply to "purchase land, hold it and sell it." (Doc. 82-8, Exh. 7).

In 2006, Recorp Inc. (a non-existent entity that was allegedly used to refer to all of the Maniatis companies with a stake in Rio West) acquired interests in deep well groundwater appurtenant to the Maniatis-owned properties, and in 2007, Recorp Inc. executed a memorandum of understanding with the local county to develop the deep water wells. (Doc. 84 ¶¶ 25–33). Recorp Inc. continued to develop the water interests, and two water wells were drilled on Carinos's property.

Defendant IMH Financial Corporation ("IMH") is an institutional real estate lender and investor that loaned money to Mr. Maniatis. (Doc. 84 ¶¶ 4, 6). In 2010, Mr. Maniatis defaulted on these loans, and in 2012, IMH won a multi-million dollar judgment against Mr. Maniatis in Arizona state court. (Doc. 84 ¶¶ 6, 8). As part of the judgment, Mr. Maniatis transferred ownership of RII to a wholly-owned IMH entity named Stockholder, LLC, and the state court appointed David M. Reaves to serve as the receiver over Stockholder. (Doc. 84 ¶¶ 10–11). Since this transfer and appointment in June 2013, IMH is the sole member of Stockholder, and Stockholder is the sole shareholder of RII.

exhibits and does not consider the short descriptions as additional statements of fact.

(Doc. 84 ¶ 12). Also, as a result of the winding up of Mr. Maniatis's estate, IMH affiliates gained a 36 percent membership interest in Carinos. (Doc. 84 ¶ 16).

In short, IMH owns Stockholder; Stockholder owns RII; and RII manages Carinos. IMH owns 36 percent of the membership interest in Carinos, and the Plan owns 28 percent of the same.

In November 2015, an IMH subsidiary sued Carinos and other Recorp entities in New Mexico state court to recover funds due on an alleged secured debt executed by Maniatis in 2010. (Doc. 84 ¶ 47). In February 2016, IMH sued Carinos in Arizona state court to recover unpaid management fees that Carinos should have paid RII, as well as unpaid funds on an alleged unsecured debt. (Doc. 84 ¶ 49). Neither Carinos nor RII has had any income or funds since at least the filing of the lawsuits in the two states. (Doc. 84 ¶ 54). Consequently, RII notified Carinos's members that Carinos lacked sufficient funds to defend itself, (Doc. 84 ¶ 53), and the Plan subsequently intervened to defend Carinos against the IMH lawsuits. (Doc. 84 ¶ 60).

In the underlying state lawsuits, the Plan challenges the legitimacy and amounts of Carinos's alleged unpaid debts to IMH and RII. (Doc. 91 ¶¶ 15–29). The Plan claims that IMH and RII knew that Carinos could not pay the alleged debts or defend the lawsuits, and the lawsuits would therefore cause Carinos to be in default. (Doc. 91 ¶¶ 28–29). IMH could then obtain a judgment lien against Carinos's properties. (Doc. 29). Plaintiff Plan intervened in the Arizona and New Mexico litigations and Carinos did not default. (Doc. 84 ¶ 60).

Plaintiff is a qualifying plan under the Employee Retirement Income Security Act ("ERISA"). In the present lawsuit, Plaintiff alleges that RII and IMH are fiduciaries under ERISA, and that their actions surrounding the New Mexico and Arizona lawsuits breached their duties. (Doc. 29). Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment both concern the ERISA fiduciary claim and are presently before the Court.

## I. Legal Standard

The Court grants summary judgment when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court views the evidence "in a light most favorable to the non-moving party." *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). Where the parties have filed cross-motions for summary judgment, the Court "evaluate[s] each motion independently, 'giving the nonmoving party in each instance the benefit of all reasonable inferences.'" *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2015) (quoting *ACLU v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).[2] The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a

---

[2] The Plaintiff asked the Court to disregard new arguments made for the first time in reply briefings. (Doc. 95). The Court grants the motion in part and denies the motion in part. Courts should not consider new arguments presented in a reply brief, *see Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996), but courts should allow parties to support arguments made in the original motion and rebut arguments made in the opposition's response. *See Rawls v. Maricopa Cty.*, 2010 WL 2927309 at *1 (D. Ariz. July 23, 2010). Therefore, the Court will not consider truly new arguments made in either parties Reply briefs, but it will consider arguments that either support original arguments or rebut counterarguments.

1    verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054,

2    1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248).

3    **II.    Analysis**

4        **A.    Defendant IMH's Control of the Plan's Assets**

5          The Employee Retirement Income Security Act ("ERISA") "governs the

6    administration of employer-provided benefit pension plans." *Metro. Life Ins. Co. v.*

7    *Parker*, 436 F.3d 1109, 1111 (9th Cir. 2006). The ERISA statute defines a fiduciary as a

8    person who exercises any discretionary authority respecting management of a plan's

9    assets, renders investment advice for a fee to the plan, or has any discretionary authority

10   in the administration of the plan. 29 U.S.C. § 1002(21)(A)(i)–(iii). In short, a fiduciary

11   is "someone acting in the capacity of manager, administrator, or financial adviser to a

12   'plan.'" *Pegram v. Herdich*, 530 U.S. 211, 222 (2000) (citing 29 U.S.C. §

13   1002(21)(A)(i)–(iii)). This definition is "functional rather than formal" and depends on

14   the person's exercise of discretionary authority instead of any designations as a fiduciary.

15   *Parker v. Bain*, 68 F.3d 1131, 1139–40 (9th Cir. 1995); *see also Santomenno v.*

16   *Transamerica Life Ins. Co.*, 883 F.3d 833, 837 (9th Cir. 2018) (holding that a party not

17   named in the plan may be a functional fiduciary if it exercises discretionary authority of

18   plan assets as described in 29 U.S.C. § 1002(21)(A)). As described in Section II.B, *infra*,

19   if an ERISA plan holds 25 percent or more of the value of equity interests in an entity,

20   then the plan's assets include the underlying assets of the entity, and any person "who

21   exercises authority or control respecting the management or disposition of such

22   underlying assets . . . is a fiduciary of the investing plan." 29 C.F.R. § 2510.3–

23   101(a)(2)(ii). Neither party disputes that the Plaintiff Plan owns a 28 percent interest in

24   Carinos, and therefore, the question is whether IMH exercises authority or control

25   respecting the management or disposition of Carinos's underlying assets.

26         IMH's connection to Carinos's assets is not direct. IMH owns Stockholder;

27   Stockholder owns RII; and RII manages Carinos. As further attenuation, the Arizona

28   state court supervises the Stockholder receiver and may override his decisions. However,

notwithstanding the indirect chain, the Plan presents contending facts that IMH does exercise discretionary authority over Carinos's assets. IMH represents itself as the owner of Carinos's properties. (Doc. 91, Exhs. 35, 112). IMH has obtained appraisals of the property, (Doc. 91, Exhs. 41–43), and IMH has discussed the sale of Carinos's property to potential buyers, as evidenced by an email from the IMH CEO discussing the sale of various Rio West properties owned by IMH entities including the Carinos properties. (Doc. 91, Exhs. 74–79). IMH controls physical access to Carinos's property, as evidenced by a January 2017 email where an IMH vice president informed security personnel that "IMH authorizes" certain individuals to visit the wells on Carinos's property. (Doc. 91, Exh. 132).

These facts and others indicate that a reasonable jury could find that IMH "exercises any authority or control respecting management or disposition of [the Plan's] assets . . . ." 29 U.S.C. § 1002(21)(A)(i). Therefore, the Court denies Defendants' Motion for Summary Judgment concerning IMH's status as an ERISA fiduciary.

**B.  Defendants' Real Estate Operating Company Exception**

Federal regulations dictate which of ERISA pension plan investments are covered by ERISA. 29 C.F.R. § 2510.3–101(a)(1). The rule at issue in this case is an exception to an exception of the standard rule. First, the standard rule: "Generally, when a plan invests in another entity, the plan's assets . . . do not . . . include any of the underlying assets of the entity." 29 C.F.R. § 2510.3–101(a)(2). The exception to the general rule: for substantial investments in private entities without public reporting obligations, the plan's assets include "an undivided interest in each of the underlying assets of the entity," and any person "who exercises authority or control respecting the management or disposition of such underlying assets . . . is a fiduciary of the investing plan." 29 C.F.R. § 2510.3–101(a)(2)(ii). Last, the exception to the exception: ERISA regulations do not apply to the underlying assets of these excepted private entities if "[t]he entity is an operating company." 29 C.F.R. § 2510.3–101(a)(2)(i)–(ii).

The term "operating company" includes a "real estate operating company." 29

C.F.R. § 2510.3–101(c).

> An entity is a "real estate operating company" for the period beginning on an initial valuation date . . . or for the 12 month period following the expiration of an annual valuation period . . . if:
> (1) On such initial valuation date, or on any date within such annual valuation period, at least 50 percent of its assets . . . are invested in real estate which is managed or developed and with respect to which such entity has the right to substantially participate directly in the management or development activities; and
> (2) During such 12 month period . . . such entity in the ordinary course of its business is engaged directly in real estate management or development activities.

29 C.F.R. § 2510.3–101(e).

The initial valuation period is "[t]he first date on which an entity makes an investment," and the annual valuation period is "a preestablished annual period, not exceeding 90 days in duration, which begins no later than the anniversary" of the initial valuation date. 29 C.F.R. § 2510.3–101(d)(5)(i)–(ii). Under this rule, an entity's status as a real estate operating company may fluctuate from year to year depending on whether it met the requirements to qualify for that annual period. *See* CREF Real Estate Account, S.E.C. No-Action Letter, 1993 WL 386656 at *9–*10 (July 22, 1993) (explaining that a real estate account is only subject to ERISA "[t]o the extent (and for such time as) the [real estate] account does not qualify as a REOC").

The parties have not presented any case law interpreting the regulation's definition of a real estate operating company or the "ordinary course of business" requirement. Given the lack of interpretive authority, the Court considers the specific examples in the regulation for guidance. In one example, a limited partnership primarily engages in investing in real property, but gives responsibility for management and maintenance to the lessees. This limited partnership is not a real estate operating company "merely because it assumes the risks of ownership of income-producing real property." 29 C.F.R. § 2510.3–101(j)(7). The next example is similar, except the lessees are not responsible for management and maintenance. Instead, the limited partnership hires independent contractors to negotiate individual leases, maintain the common areas, and conduct

maintenance activities, and the limited partnership has the responsibility to supervise and terminate the contractors. In this example, the limited partnership is a real estate operating company, and the fact it hires contractors and "does not have its own employees who engage in day-to-day management and development activities is only one factor in determining whether it is actively managing or developing real estate." 29 C.F.R. § 2510.3–101(j)(8). In the final example, a limited partnership makes convertible loans to finance purchases of real property. The loan terms give the limited partnership rights to substantially influence the management of the property, and the limited partnership ratably shares any capital expenditures relating to the property. Lastly, the limited partnership "in the ordinary course of its business, routinely exercises its management rights and frequently consults with and advises the borrower and the property manager." 29 C.F.R. § 2510.3–101(j)(9). The limited partnership in this final example is a real estate operating company. *Id.*

The Federal Register entry for the REOC final rule also provides some guidance. Because "many real estate companies have characteristics of both operating companies and investment funds," the regulations "intended to provide guidance in determining whether the operating company exclusion would be available for such companies." 51 Fed. Reg. 41262, 41270 (Nov. 13, 1986). "[M]ere equity ownership of real property is not sufficient to qualify for the real estate operation company exception." *Id.* at 41274. "[W]hether a company is actively involved in the management or development of a particular parcel of real estate is ultimately a factual question that must be resolved on a case by case basis." *Id.* at 41275. The final rule is meant "to ensure that only those entities which demonstrate a substantial ongoing commitment to managing and developing real estate will qualify for treatment as real estate operating companies . . . ." *Id.* at 41275.

In the Defendants' motion for summary judgment, HMI and RII ask the Court to affirmatively grant their REOC defense. Defendants claim that Carinos is a qualified REOC under the two prong test in 29 C.F.R. § 2510.3–101(c) that (1) at least 50 percent

of Carinos' assets are real estate during the annual valuation period, and (2) Carinos engaged directly in real estate management or development in the ordinary course of business. Because an entity is only subject to ERISA for such time as it does not qualify as a REOC, the Court considers only the time period when the Defendants need to invoke the REOC defense. The Plan's amended complaint alleges that IMH and RII breached their ERISA fiduciary duties by failing to provide material information to the Plan and by pursuing litigation against Carinos. (Doc. 29 at ¶¶ 30–55). The alleged misconduct first took place as early as IMH's acquisition of its interests in Carinos in 2015 and lasted through the filings of the lawsuits in 2016.

Concerning the first prong, the parties do not dispute that more than 50 percent of Carinos' assets are real estate. Concerning the second prong, various facts contend against Defendants' assertion of the REOC exception. The Defendants repeatedly point to the wells on Carinos' property as evidence of real estate development, but the mere existence of the two wells is not enough to warrant the REOC exception; Carinos must also directly engage in managing or developing the wells. The record does not support this conclusion. In June 2016, IMH participated in a conference call concerning a strategic plan for the wells on Carinos's property. (Doc. 84-13, Exh. NNN). The meeting summary notes that "IMH is one of the parties involved in the ownership of this site but, [sic] serves as the only entity expressing an interest and willingness to invest in the development of this water resource." *Id.* It further states that the two wells on Carinos's property "have been left unmaintained for several years. They have been vandalized, suffered from corrosion and formed periodic leaks causing uncontrolled and unpermitted flow from the wells onto the well site." *Id.* IMH, and not Carinos, immediately moved to repair the leaks. *Id.* No Carinos representatives participated in the meeting, and nothing mentions Carinos in the summary report. *Id.* The condition and maintenance of the wells in June 2016 contend against Defendants' assertion that Carinos was directly engaged in management or development activities during the applicable time frame. Therefore, the Court denies Defendants' motion for summary judgment

concerning the REOC exception.

Similarly, in the Plaintiff's motion for partial summary judgment, the Plan asks the court to affirmatively deny Defendants' affirmative defense that Carinos is a real estate operating company and exempt from ERISA requirements. (Doc. 81 at 2; Doc. 16 at 7; Doc. 40 at 9). As noted, the Court independently evaluates cross motions and gives the nonmoving party the benefit of all reasonable inferences. *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2015). The Plan's motion is based solely on Carinos's failure to meet the "ordinary course of business" prong in the REOC regulatory definition. Again, to qualify as a REOC, an entity must engage directly in real estate management or development activities in the ordinary course of business, and it must do so during the applicable time period. 29 C.F.R. § 2510.3–101(e)(2).

Defendants IMH and RII state that Carinos has been consistently working on developing the property by developing master plans, obtaining impact studies and other reports, entering into development agreements with local entities, drilling for water, and maintaining these wells. (Doc. 88 at 7). These activities, however, occurred years prior to the alleged fiduciary breaches.

The record describes the state of Carinos's property during the applicable time period. In an October 2015 letter, and again in a November 2015 letter, the Stockholder Receiver stated that Carinos does "not conduct any business other than to hold undeveloped land, and thus the only records of the entities generated post-receivership would have been the tax returns." (Doc. 82-6, Exh. 5; Doc. 91-15, Exh. 153). And, Carinos's tax returns support the Stockholder's claim that Carinos does not conduct business other than holding undeveloped land. In 2014, Carinos had $266.00 in cash and had no new liabilities or income during the year. (Doc. 82-19, Exh. 17). In 2015, which is the last tax year provided in the record, Carinos had $0.00 in cash and incurred $3,650 in professional fees and $266 in receivership fees. It had no other new income or liabilities during 2015. (Doc. 82-19, Exh. 18). These tax returns list Carinos's principal business activity as "investment," which is internally consistent with Carinos holding

more than $1 million worth of assets in land. (Doc. 82-19, Exhs. 18–19).[3] And again, the June 2016 conference call indicates that "IMH . . . serves as the only entity expressing an interest and willingness to invest in the development of this water resource[,]" which "have been left unmaintained for several years." (Doc. 84-13, Exh. NNN). All of these facts support the understanding of the Plan's Trustee that Carinos' purpose was to "purchase land, hold it and sell it." (Doc. 82-8, Exh. 7).

Even when viewing the record in a light most favorable to Defendants, it does not create a triable issue of fact concerning Carinos' direct engagement in real estate management or development during the periods at issue. As a matter of law, Carinos has not demonstrated a substantial ongoing commitment to managing and developing real estate. Therefore, the Court grants Plaintiff's Motion for Partial Summary Judgment.

## C.   Whether Defendants Violated Fiduciary Duties

In its complaint, the Plan generally alleges that IMH and RII breached their ERISA fiduciary duties by pursuing unmerited litigation against Carinos, and RII additionally breached its fiduciary duty by failing to provide material information to the Plan. (Doc. 29 at ¶¶ 30–55). In their motion for summary judgment, IMH and RII asked the Court to hold that neither party breached its fiduciary duty. (Doc. 83).

### 1.   The Arizona and New Mexico Lawsuits

An ERISA fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The duties of an ERISA fiduciary are the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quotation omitted). The simple act of a fiduciary having conflicting interests is not a per

___

[3] Also of note—from 2006 to present, the Rio West entities, including Carinos, have leased the property to cattle ranchers, but the agreement states that the rancher lessee "shall, at its own cost and expense, keep and maintain the Premises, all fences and improvements on the Premises, and all facilities appurtenant to the Premises in good order and repair . . . ." (Doc. 84-1 Exh. S). Again, an entity that invests in real property—but gives responsibility for management and maintenance to the lessees—is not a real estate operating company. 29 C.F.R. § 2510.3–101(j)(7).

se violation of ERISA, but neither does a conflicting interest excuse a fiduciary from meeting its obligations to a qualifying plan. *See Friend v. Sanwa Bank California*, 35 F.3d 466, 469 (9th Cir. 1994).

There is a question of fact concerning defendants' alleged breach of their fiduciary duties. The Plan alleges that the litigation in Arizona and New Mexico concern suspect debts that allow IMH to obtain judgment liens on Carinos' property. (Doc. 29). To support this claim, the Plan points to its potential defenses in the underlying Arizona and New Mexico suits. As one example, IMH and RII are suing Carinos for unpaid management and accounting fees. Carinos' documents indicate that it owed RII $1,662.73 as of December 31, 2012, but IMH and RII revised those calculations to assess management fees of $87,500 and accounting fees of $63,743.35 from 2004 to 2017. (Doc. 91 at 7, ¶¶ 19–22). The Plan also points to evidence that RII is unable to claim a basis for revising the account to assess the maximum assessable amount under Carinos' operating agreement. (Doc. 91 at 8, ¶ 25). As another example, the Plan points to evidence that IMH and RII cannot authenticate the debt that Carinos owes IMH in the Arizona litigation. (Doc. 91 at 8, ¶ 26). If the debts and fees in the underlying suits are legitimate, then the Defendants' pursuit of them would not generally breach their fiduciary responsibilities. *See Pegram v. Herdich*, 530 U.S. 211, 225–26 (2000). However, the Plan has shown a question of fact concerning the legitimacy of the debts and fees. If so, a jury could conclude that IMH and RII breached their ERISA fiduciary duties to care for the Plan's assets.

### 2. Disclosure of Material Information

"The duty of loyalty is one of the common law trust principles that apply to ERISA fiduciaries, and it encompasses a duty to disclose." *King v. Blue Cross and Blue Shield of Illinois*, 871 F.3d 730, 744 (9th Cir. 2017) (quoting *Washington v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 504 F.3d 818, 823 (9th Cir. 2007) (internal quotation marks and citation omitted)). In the Ninth Circuit, ERISA fiduciaries have "an obligation to convey complete and accurate information material to the beneficiary's circumstance,

even when a beneficiary has not specifically asked for the information." *Farr v. U.S. West Communications, Inc.*, 151 F.3d 908, 914 (9th Cir. 1998) (quoting *Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995).

Around September 2015, the Plan began requesting communications and reports regarding the management, maintenance, or sale of Carinos. (Doc. 84-16, Exh. 7). Later that month, the Plan reviewed various documents provided in response to that request. *Id.* At a February 2016 meeting of Carinos members, meeting notes indicate that the Plan had reviewed additional documents provided to the Plan. *Id.* Although RII responded to these requests and provided some of the requested documents, there is some evidence that they did not provide a complete record of all material information. In a sworn declaration, Mr. Thor Kolle, one of the Plan's trustees, testified that prior to this present lawsuit, neither RII nor IMH provided the Plan with all of their requested documents, including documents concerning the sale and appraisal or offers for Carinos' real estate. (Doc. 91, Exh. 154). He further stated that he received various documents from IMH as a result of the present lawsuit that were responsive to his previous request, which the Defendants had previously withheld. *Id.* *See also* Doc. 91, Exh. 155 (describing documents provided in result of this lawsuit as "business records of Carinos, grazing leases on Carinos' property . . . , communications between various parties involved with the Rio West project; and memorandums, site assessments, and other evaluations of the Rio West property"). The Plan alleges that the withheld information concerned the sale of the property and informed the legitimacy of the Arizona and New Mexico lawsuits, and is therefore material to the beneficiary's circumstances. (Doc. 91 at 9, ¶ 31).

Considering Mr. Kolle's declaration, there is a question of fact whether RII met its "obligation to convey complete and accurate information material to the beneficiary's circumstance." *Farr*, 151 F.3d at 914. The Court denies Defendants' motion for summary judgment concerning its fiduciary duty to disclose material information.

### 3. Losses Resulting from Breach

A fiduciary is liable only for "losses to the plan resulting from each such breach."

29 U.S.C. § 1109(a). As of July 2017, the Plan had spent approximately $100,000 to intervene and defend the New Mexico and Arizona lawsuits, and that cost continues to increase. (Doc. 84 at 9, ¶ 61). If, as described in II.C.1, *supra*, the state court lawsuits are based on unfounded fees and debts and constitute a breach of ERISA fiduciary duties, then the Plan's expenditure to defend the lawsuits would be losses resulting from a fiduciary breach. Accordingly, the Court denies Defendants' Motion for Summary Judgment concerning IMH's and RII's breach of fiduciary duties.

## III.    Plaintiff's Request to Bifurcate and Stay

The Plan asked the Court to bifurcate the issue of Defendants' breach of fiduciary duties from the ERISA coverage issue pursuant to Rule 42(b). (Doc. 94). Rule 42(b) states that a court may order a separate trial of separate issues for convenience, to avoid prejudice, or to expedite and economize. A District Court has broad discretion to bifurcate trials. *United States v. 1,071.08 Acres of Land, Yuma and Mohave Counties*, 564 F.2d 1350, 1352 (9th Cir. 1977). "'The piecemeal trial of separate issues in a single lawsuit . . . is not to be the usual course,' however, and will be ordered only where the party seeking separate trials meets his or her burden of proving that bifurcation is necessary." *Lassley v. Secura Supreme Ins. Co.*, 2015 WL 5634307 at *2 (D. Ariz., Sept. 15, 2015) (quoting 9A Charles Alan Wright & Arthur R. Miller, et al., Fed. Prac. & Proc. Civ. § 2388 (3d ed.)). The Plan has not yet met such a burden. The Court therefore denies the motion without prejudice.

The Plan also requested the Court to stay the current litigation pending the outcome of the lawsuits in Arizona and New Mexico. (Doc. 94). The Plan argues that the alleged fiduciary breach depends on whether the state lawsuits have merit, and the Court should postpone the present lawsuit until the state courts decide if those lawsuits have merit. *Id.* A federal court does not usually postpone the exercise of jurisdiction for the resolution of concurrent state proceedings, and will only do so for rare and exceptional cases when the clearest of justifications support it. *R.R. Street & Co. Inc. v. Transport Ins. Co.*, 656 F.3d 966, 977–79 (9th Cir. 2011) (citing *Colorado River Water*

*Conservation Dist. v. United States*, 424 U.S. 800 (1976)).

The Plan presents clear justifications to support a stay in this current case. Its claim in the present lawsuit (that RII and IMH breached their ERISA duties in their actions surrounding the New Mexico and Arizona lawsuits) depends, at least to some extent, on who prevails on the underlying claims. Consequently, the Court would need to determine the merits of the underlying lawsuits. To avoid the risk of inconsistent rulings on issues of state law, the Court grants Plaintiff's motion to stay this lawsuit pending the resolution of the New Mexico and Arizona Litigation.

## CONCLUSION

For the reasoning described above, the Court rules as follows:

**IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion for Partial Summary Judgment (Doc. 81) is **GRANTED**;

2.      Defendants' Motion for Summary Judgment (Doc. 83) is **DENIED**;

3.      Plaintiff's Motion to Strike (Doc. 86) is **DENIED**;

4.      Plaintiff's Motion to Bifurcate Case and Stay (Doc. 94) is **GRANTED IN PART AND DENIED IN PART**. The Clerk of Court is directed to stay this action**;**

5.      Plaintiff's Motion to Disregard New Arguments (Doc. 95) is **GRANTED IN PART AND DENIED IN PART**.

6.      The parties are to file a joint status report on or before **July 25, 2018**, and **every 90 days thereafter** until the stay has been lifted, or the Court rules otherwise.

Dated this 26th day of April, 2018.

Honorable G. Murray Snow
United States District Judge